Civil Action No. 08-cv-01874-MSK-KMT

MONICA M. WHITE,

      Plaintiff,

v.

EDWARD T. SCHAFER, Secretary, United States Department of Agriculture,

      Defendant.

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(# 57**, as amended **# 82)**, the Plaintiff's response **(# 72)**, and the Defendant's reply **(# 81)**.

## <u>FACTS</u>

      It has been somewhat difficult for the Court to discern the operative facts in this matter. The Complaint **(# 1)** is entirely conclusory, asserting no specific facts underlying the claims herein. The parties' summary judgment briefs reflect that the parties themselves have differing notions of the issues in the case. The Defendant's motion reflects a belief that Ms. White, a Wildlife Biologist employed with the National Forest Service ("NFS"), complains primarily about sex discrimination and harassment she experienced when she was asked to relinquish a private office she had been given as an accommodation for her need to breastfeed her children. Ms. White's response states that the NFS "moving [her] out of the private office space . . . is not

the adverse action" giving rise to her claims, but rather, the NFS' "interference with [her] job duties and career, most recently when it breached [a] February 28, 2006 mediation agreement" concerning the apportionment of her job tasks.

Ascertaining the precise contours of Ms. White's claims is also difficult because she frames her factual presentation regarding a given claim and element as a response to the arguments raised by the NFS, rather than affirmatively setting forth the particular facts that support each element of her claims. For example, in responding to the NFS' contention that she cannot establish an adverse action supporting her sex discrimination claim, Ms. White does not dispute the NFS set forth 104 factual allegations in its motion regarding accommodations made by the NFS with regard to her maternity status, but explains that "the particular accommodations the [NFS] afforded [her] are not the basis for her disparate treatment claim . . . Rather, it is the fact [that she] had to fight to get any of these accommodations or benefits . . . that support her disparate treatment claim." The final sentence is annotated with a single citation to 11 pages of single-spaced diary entries dating back to 2003, and moves on without further comment or elaboration. Nowhere in her response brief does can the Court find an identification of the particular adverse actions that give rise to her claims.

The Court does not intend to venture, unguided, into a lengthy and unfocused chronology in an attempt to unearth facts that might be said to support Ms. White's claims. In the summary judgment process, it is the obligation of the parties, through their counsel, to sift the mountain of evidence, extracting and identifying only the specific and precise facts that bear on the claims asserted, and then to present the evidence of those facts a clear and organized way. As a result, the Court will limit its analysis to <u>only</u> those facts that have been identified in the parties' briefs,

and will refer to the supporting evidence only in those circumstances where there is a dispute between the parties as to whether the fact recited in the brief is consistent with the underlying evidence. In this respect, then, the following facts are undisputed.

In 2001, Ms. White was given a permanent position with the NFS as a Wildlife Biologist, a job that placed her at the GS-9 salary scale. At that time, she was supervised directly by Sam Schroeder, who, in turn, was supervised by Charlie Medina. Her duties were "primarily in range, livestock grazing and administrative," but also entailed "wildlife, fishery, and also noxious weeds." The "range" portion of her work required her to "interact with holders of cattle grazing permits on [NFS] land."

In November 2002, Ms. White informed Mr. Schroeder that she was pregnant with her first child. In February 2003, she submitted a proposal to the NFS providing for maternity leave from June 16 to August 22, 2003; a request that she be permitted to bring her child into the office for a "transition" period of three to eight months; a request that she be relocated from her assigned cubicle to a private office with a door so as to permit her to breastfeed for a period of three to eight months; and a "flexiplace" agreement that would allow her to work from home, periodically. The NFS acceded to each of these requests. When she returned from her maternity leave, Ms. White requested that she be permitted to reduce her workload from 40 to 32 hours per week, citing difficulty balancing full-time work and day care, and that request was granted.

In January 2004, Mike Sugaski, an NFS supervisor who was not directly responsible for overseeing Ms. White, requested that Ms. White vacate the office she was occupying, as Mr. Sugaski believed that the office should be given to one of his employees. In response to that request, Mr. Medina convened a committee on office space to address the matter of office

assignments.  Ms. White was one of the people designated to serve on that committee.  In February 2004, the committee devised a floor plan that, over Ms. White's objection, assigned the office Ms. White was occupying to a GS-11 grade employee assigned the job of NEPA Coordinator.  The committee proposed that appropriate furniture be placed in a conference room and that a lock be installed on that room's door, such that Ms. White could use that room for breast feeding.  Ms. White responded that that proposal was unacceptable.  Despite the committee's conclusion, Mr. Medina allowed Ms. White to continue occupying the private office.

In March 2004, when Ms. White's child was ten months old, Mr. Medina asked Ms. White when she expected to finish nursing, as he intended to move another employee into the private office space.  Ms. White responded that she was continuing to nurse and again refused to accept the alternative of using the conference room for that purpose.  Mr. Medina allowed her to continue to occupy the private office through June 2004, when she weaned her child, and even thereafter, she continued to occupy the private office.

In March 2005, Ms. White announced that she was pregnant with a second child.  In April 2005, Mr. Medina instructed Ms. White that she needed to move out of the office, which would then be assigned to Mike Picard, the NEPA Coordinator, as the office space committee had determined.  Ms. White insisted that she had a continuing need for the private office, citing her anticipated need to nurse her second child, due in September 2005.  Mr. Medina allowed Ms. White to continue to occupy the private office.

Ms. White sought and was granted maternity leave following the birth of her second child.  She returned from leave in January 2006.  During her leave, her range duties were

reassigned to other employees. Ms. White contends that, as a result, she "did not have a job to which she could actually return."

The deposition excerpt cited to in support of this conclusory assertion reflects that, near the end of Ms. White's maternity leave, Ms. White, Mr. Schroeder, and Mr. Medina all believed that Ms. White would apply for and receive a promotion to the position of Forest Planner. In the interim, the NFS hired Lisa Van Amburg to deal with range duties while Ms. White was out on leave. Upon Ms. White's return, Ms. Van Amburg continued to work on range duties, and Ms. White was told to "keep working on [the] range allotment management plan." Ms. White states that she resumed meeting with grazing permit holders upon her return (Ms. Van Amburg notwithstanding, apparently), but the permit holders' attitude towards her had changed significantly, and many indicated that they believed that Ms. Van Amburg would be replacing her. The permit holders may have reached that conclusion because Mr. Medina had told them that Ms. White was intending to "move on to a forest planning position," even though she had asked him not to share that fact with the permit holders.

On or about January 31, 2006, Ms. White complained to Bob Leaverton, Mr. Medina's supervisor, that she felt that the NFS was "pushing her out of a job." (The issue appears to relate to difficulties that Ms. White faced with the grazing permit holders as a result of Mr. Medina's statements to them about her likely promotion.) Mr. Leaverton told Ms. White that "culturally, she would never fit in" with the permit holders because she was a female, "did not wear a big belt buckle, and had not grown up on a ranch." Ms. White testified in her deposition that "we had talked about how it was, you know, very hard for women in – or how – his impression was that it was very hard for women in the range field," and that her interpretation of his comment

was that he was "referring to the culture of the permitees," not the culture of the NFS. Nevertheless, at the conclusion of this meeting, Ms. White informed Mr. Medina that she wished to file a grievance over her job situation.

On or about February 28, 2006, Ms. White engaged in a "mediation" with Mr. Medina and Mr. Leaverton concerning her job duties. The result of this mediation was a written agreement that provided that:

> subject to the approval of other decision makers, [Ms. White] will remain in her current PD [position description?] & go to permanent part time employment at 40 hours per pay period [*i.e.* 20 hours per week].[1] She will report to Mike Wrigley and devote ½ time to wildlife biology and ½ time to range analysis.

(The remainder of the agreement addressed a separate mediation that would occur between Ms. White and "Willie," concerning "technical issues of range management," and noted that Mr. Leaverton, Mr. Medina, and Ms. White's "efforts to negotiate in good will are noted & appreciated individually.")

In late April 2006, Mr. Picard told Ms. White that he wished to begin occupying the private office, as the office space committee had assigned that office to his position. An argument ensued, but Ms. White was allowed to stay in the office, and Mr. Picard was given an office in another part of the building. In May or June of 2006, Craig Yancey, Mr. Medina's

---

[1]Ms. White states that she requested a schedule reduction because she had already made child care arrangements anticipating that, when she returned from maternity leave, she would be promoted to Forest Planner, a 20-hour per week position. When that position did not promptly materialize, Ms. White felt that the day care situation left her no choice but to seek a 20 hour per week schedule as part of her current job (in addition to her concern that, because of Mr. Medina's remarks to the grazing permit holders, she no longer had the credibility needed to perform the range duties.) The Court does not understand Ms. White to allege that the failure of the Forest Planner position to be posted on the schedule that she and her supervisors anticipated is itself a discriminatory action.

replacement, met with Ms. White and Mr. Picard and suggested that Ms. White relinquish the office to Mr. Picard (as per the office space committee's conclusion) and instead take the alternative office elsewhere in the building that Mr. Picard had been given. Ms. White resisted, stating that she wished to remain in the private office until her child was one year old.

On May 22, 2006, Mr. Yancey told Ms. White that he wanted to change her job duties so that she would spend more time on range duties. (Ms. Van Amberg had apparently found another job and left the NFS.) Mr. Yancey stated that he had discussed the matter with Mr. Medina, Mr. Leaverton, and Mr. Schroeder, and all had agreed that Ms. White "was the best person for the job." Ms. White was surprised, as "just a few months ago, it was determined that I was not capable" of doing the range work. Mr. Yancey proposed that work that Ms. White was currently doing with a noxious weed program would transition to another employee, but Ms. White was upset, as she "had ownership in the weeds program."

On May 25, 2006, Ms. White filed an informal complaint of discrimination with the NFS Equal Employment Opportunity ("EEO") office. That complaint recited:

> 1. Repeated harassment regarding my status as a nursing mother in the workplace. Derogatory comments, bullying and harassment have occurred over the past 4 years . . . The most recent situation was regarding moving from my current office space to which I was assigned over 3 years ago.
>
> 2. Discrimination as a woman in the office in regard to my office space assignment and change in job duties. I was subjected to bullying and harassment when I was assigned to the vacant office space. Meanwhile, a man of same grade, status, and job duties received no harassment when he moved into a similar vacant office at the same time. I recently made a change in job duties because management did not feel that I "fit in" due to my gender, cultural upbringing and size of my belt buckle. Job duties have been removed from me without consultation and yet I am still being asked to perform duties that are outside of a mediation agreement

that was being implemented.

> 3.  I discussed with the EEO counselor my feelings of having the decision about office space held over my head as a bargaining tool for management to force me to conduct work that I felt was outside of a mediation agreement that I had in place regarding a change in my job duties.  The EEO counselor was told that I would have to go back to mediation regarding the issue with the agreement and that I could not tie the two issues together for the EEO complaint even though I believed them to be connected.

At this point, the Court digresses from a chronological recitation of the facts to address the allegation in Ms. White's EEO complaint that she had been subjected to "derogatory comments, bullying, and harassment."  The NFS contends that Ms. White has identified only the following comments or events (in addition to those already set forth herein) as constituting the "derogatory comments, bullying, and harassment" she refers to in the EEO complaint.  Ms. White's response brief does not disagree that the following items are the only additional instances of harassment she complains of, and offers only clarification or context with regard to some of the events (the Court has incorporated Ms. White's clarifications into this recitation):

> • In 2003, during discussions with Ms. White about her need for a private office when nursing her children, Mr. Medina made comments regarding his own wife's membership in the Le Leche League and about "what a big deal it was" that his wife would nurse their baby in church.

> • Mr. Medina commented to Ms. White that "in Wyoming, breast-feeding did not continue past six weeks," a comment Ms. White understood to "imply[ ] criticism of her plans to nurse longer."

> • At some point in 2003, Ms. White reported to Mr. Medina her findings about how the NFS office in Washington, D.C. provided breast pumping facilities for nursing mothers.  Mr. Medina responded with a comment to the effect that the mothers "would be lined up like cows" and asked Ms. White to "imagine all the women lining up in Washington at the pumping stations."

• In January 2006, during a meeting with grazing permit holders, Mr. Medina commented that Ms. White had been away from work "calving." The permit holders "chuckled" at this comment, but Ms. White felt "disrespected, humiliated, and belittled."

• Sometime between November 2002 and January 2003, in the context of discussing maternity leave, Mr. Schroeder made a comment to the effect that Ms. White should "do like the Indians and go squat in the woods, get your baby on your back, and get back to work." Ms. White states that she did not feel "humiliated" by this comment, but was "shocked" at the "inappropriate[ness]" of the comment.[2]

• At some point during her pregnancy in 2003, Mr. Schroeder responded to Ms. White "speaking passionately about something" by commenting that "he couldn't wait until [her] pregnancy was over and [her] hormones returned to normal because he lived with a menopausal wife and a pubescent daughter." Ms. White states that she felt "belittled . . . because he was just pawning [her passion] off to hormones."

• In April 2003, Mr. Sugaski came into the private office and told Ms. White, then eight months pregnant, that he needed the furniture that was there. Although she contends she felt "intimidated," by Mr. Sugaski, she got "pissed off" and told him "this is bullshit" and asked him if he "expected her to sit on the floor." Ms. White complained to Mr. Medina about this incident, and Mr. Medina told her that "he would deal with" Mr. Sugaski. Ms. White admits that Mr. Sugaski never raised the issue of furniture with her again and that the furniture was not removed from the office.

• During meetings of the office space committee, which both Ms. White and Mr. Sugaski were on, Mr. Sugaski asked Ms. White to "describe why she had a need for a private office."[3] Ms. White believes that such questions were "inappropriate," made her

_____

[2]Ms. White ascribes additional significance to Mr. Schroeder's comment because he had previously told her that he understood NFS policy to allow only six weeks of maternity leave, when she believed that the law or NFS policy authorized more.

[3]Ms. White states that Mr. Sugaski posed questions like "what is it that you need? Is it a visual issue? Is it, you know, a noise issue?"

"uncomfortable," and were "cruel and harassing for [Mr. Sugaski's] own amusement." She describes Mr. Sugaski's demeanor in these meetings as "bullying," telling her "[she] shouldn't have been in there anyway."

• Sometime in April 2006, Mr. Sugaski made a comment to Ms. White about "working on getting her office back" and chuckled.

• On April 28, 2006, Mr. Picard told Ms. White he wanted the private office, saying that "for the ten minutes a day that she needed to pump, she could use the bathroom." Ms. White understood this comment to imply that Mr. Picard "had been actually timing [her]" and she "felt violated by Mr. Picard's monitoring."

On June 7, 2006, Mr. Yancey issued a formal letter directing that Ms. White move out of the private office and take over Mr. Picard's space. Ms. White complained to Mr. Yancey about that directive, and Mr. Yancey withdrew the directive. Further discussions resulted in Ms. White and Mr. Yancey reaching a written "Agreement on Office Space Issues," in which Ms. White was permitted to remain in the office space until September 9, 2006, at which time she would move to Mr. Picard's office space. Thereafter, if she had a need for privacy, she would "be accommodated by the District's small conference room." (By this time, a lock had been installed on the conference room door.)

At this point, the parties' recitation of the facts in their briefing come to an end (with the exception of certain discussions of facts relating to the procedural handling of Ms. White's EEO complaint). Accordingly, the Court deems the foregoing to constitute the entire relevant factual record for purposes of this motion.

Ms. White asserts five claims in this action: (i) hostile environment sexual harassment, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; (ii) sex discrimination in violation of Title VII, in that she was "treated less favorably" than male employees with regard to "detail positions,

promotions, training, job duties, scrutiny, office accommodations, leave and return to work accommodations"; (iii) retaliation, in violation of Title VII, in that "the terms and conditions of her employment" were affected because of her complaining of discrimination; (iv) violation of the Privacy Act, 5 U.S.C. § 552a(b), in that the Forest Service's Equal Employment Opportunity ("EEO") officer failed to treat Ms. White's discrimination and retaliation complaints (and the facts gleaned from the investigation thereof) as private; and (v) violation of the Privacy Act, 5 U.S.C. § 552a(e)(10), in that the Forest Service failed to establish appropriate safeguards to protect the confidentiality of private information.[4]

The Forest Service moves (# 57) for summary judgment on Ms. White's claims, arguing: (i) to the extent Ms. White's claims are based on anything other than discrimination/harassment relating to her engaging in breast feeding, she has failed to exhaust those claims as required by 42 U.S.C. § 2000e-16; (ii) to the extent Ms. White's claims encompass events occurring prior to April 10, 2006, those events are untimely pursuant to 28 C.F.R. § 1614.105(a); (iii) Ms. White fails to state any claim under Title VII because breast feeding is not a protected activity or protected classification under that statute; (iv) with regard to the sex discrimination claim, Ms. White cannot demonstrate that she was subjected to an adverse employment action, cannot demonstrate that that action occurred in circumstances giving rise to an inference of discrimination, and cannot show that the Forest Service's proffered reason for its actions is a pretext for sex discrimination; (v) to the extent her sex discrimination claim is premised upon a change in job duties, she cannot show that she suffered an adverse employment action, cannot

---

[4]The Court will address the facts pertinent to the Privacy Act claims in the course of its analysis.

show that such an action occurred in circumstances giving rise to an inference of discrimination, and cannot show that the Forest Service's proffered reason for its actions is a pretext for sex discrimination; (vi) with regard to the hostile environment sexual harassment claim, Ms. White cannot show that she was subjected to conduct that could objectively be viewed as severe and pervasive; (vii) with regard to the retaliation claim, Ms. White cannot show that she was subjected to an adverse action and cannot show that the Forest Service's proffered reason for that action is a pretext for retaliation; (viii) with regard to the "improper disclosure" Privacy Act claim, Ms. White cannot show that the disclosed information was part of a "system of records," cannot show that the information was "disclosed," and cannot show that such disclosures were intentional; and (ix) with regard to the "safeguards" Privacy Act claim, Ms. White cannot show that the Forest Service failed to enact proper safeguards and cannot show that any failures were intentional.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Exhaustion and Timeliness

Title VII contains an exhaustion requirement, requiring that employees of federal

agencies first present claims of discrimination to the agency's EEO office before asserting them in a civil suit. 42 U.S.C. § 2000e-16; *Mayberry v. EPA*, 366 Fed.Appx. 907, 909 (10th Cir. 2010) (unpublished), *citing Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). The employee must present the charge to the agency's EEO office within 45 days of the date of the discriminatory act. 29 C.F.R. § 1614.105(a). The EEO office conducts an investigation and, if the employee requests, an administrative hearing. *Id.*; 29 C.F.R. § 1614.108(f). If the employee is dissatisfied with the outcome, she may then commence a lawsuit alleging the claims considered in the EEO proceedings.

The NFS initially argued that the only claims that Ms. White exhausted through the EEO process were claims concerning her assignment to office space and harassment concerning her breast feeding. Ms. White responds that her EEO complaint also mentioned discrimination regarding her assignment of job duties, and that this material was presented to and considered by the EEO hearing officer. The NFS' reply appears to concede that Ms. White has thus exhausted two types of claims: those relating to office space/harassment regarding breast feeding, and those relating to the May 22, 2006 decision of Mr. Yancey to modify her job duties. Notwithstanding the breadth of the allegations in the Complaint – which speaks of discrimination in promotions, training, leave, and other matters – the Court understands Ms. White's claims to be limited to the two categories that both sides appear to acknowledge she has exhausted.

The Court then considers the NFS' argument that Ms. White is limited to challenging those events occurring in the 45 day period prior to her informal EEO complaint on May 25, 2006 – *i.e.* those events occurring between April 10 and May 25, 2006. It is undisputed that certain events – Mr. Yancey's reassignment of Ms. White's job duties; Mr. Picard's demand to

occupy the private office – occurred during this time period, but Ms. White argues that both her hostile environment and sex discrimination claims enjoy a "continuing violation"-type accrual. The Supreme Court has recognized that hostile environment claims are unusual in the Title VII realm, as "their very nature involves repeated conduct." *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Such an environment develops over days or years, and a single act of harassment might not be actionable on its own. *Id.* Because the violation is "based upon the cumulative effect of individual acts," Title VII recognizes that such claims require specialized accrual rules for issues of timeliness. *Id.* Thus, these claims are timely if the employee files a charge based on "any act that is part of the hostile work environment" that occurred within the limitations period, even though other instances of harassment fall outside that period. *Id.* at 118.

By contrast, claims of disparate treatment involve "discrete acts" that are "easy to identify." *Id.* at 114. Claims based on such discrete acts must be asserted within the requisite time period following the act itself; *Morgan* expressly rejects any notion of a "continuing violation" theory that deems untimely acts that "are plausibly or sufficiently related to [a timely] act" to be actionable. *Id.* Thus, a simple rule can be derived: all instances of a pattern of hostile environment harassment are timely if at least <u>one</u> act in that pattern occurred within the limitations period, but <u>every</u> instance of disparate treatment claimed must have occurred within the limitations period.

Construed broadly – for limitations purposes at least – Ms. White's claimed hostile environment relating to use of her office space for breast feeding has some instances occurring between April 10 and May 25, 2006: Mr. Picard's April 22, 2006 statement that she could "use

the bathroom" for the "ten minutes per day that she needed to pump" or Mr. Sugaski's comment about "getting the office back." Thus, Ms. White's hostile environment claim, whatever the contours of it may ultimately be found to be, is timely. Similarly, one (arguably) adverse action she identifies as supporting a disparate treatment claim – Mr. Yancey's May 22, 2006 reassignment of her job duties – is timely.

It is not entirely clear to the Court what other actions Ms. White identifies as giving rise to a disparate treatment claim. She expressly references adverse actions in three portions of her response. Most clearly and directly, she states that "[the NFS'] interference with Ms. White's job duties and career, most recently when it breached the February 28, 2006 mediation agreement, is the adverse action supporting Ms. White's disparate treatment claim." In another portion of the brief, while acknowledging the various accommodations the NFS granted her regarding maternity leave, work schedule changes, and a private office for breast feeding, she argues that "it is the fact Ms. White had to fight to get any of these accommodations or benefits and the fact she never did receive some of the accommodations or benefits to which she was entitled as an employee that support her disparate treatment claim." She does not materially elaborate on how, exactly, she "had to fight to get" the accommodations, nor how the "fight" – rather than the granting or denying of the accommodations themselves – constitutes disparate treatment, nor does she explain what accommodations "she was entitled to" and did not receive. Finally, Ms. White makes a comment in her brief echoing the conclusory assertion in the Complaint: that NFS "pushed her out of her original position, denied her detail positions, promotions and transfers, denied her training and altered her job duties to such an extent that she risked being found unqualified for her own position." Except as to the May 22, 2006 incident

16

with Mr. Yancey regarding altering her job duties, it is not clear what facts Ms. White refers to with these allegations. Nothing in the factual recitation, for example, makes any reference to Ms. White "risk[ing] being found unqualified for her own position," being denied training, promotions, or transfers, or being denied "detail positions" (the meaning of that phrase being unclear).

Accordingly, the Court finds Ms. White's timely Title VII claims to be limited to the following: (i) a hostile working environment, based on sex- and pregnancy-based comments and actions by her supervisors and co-workers, focused primarily on her pregnancy and need for a private office to breastfeed; and (ii) sex discrimination and retaliation, in the form of Mr. Yancey deciding on April 22, 2006 to disregard the terms of the mediation agreement and assign her to more than 50% range work. To the extent Ms. White purports to assert any other claims, the Court finds them to be insufficiently identified, untimely, and unexhausted.

### C. Disparate treatment

The Court first turns to the disparate treatment claim premised on Mr. Yancey's attempt to rebalance Ms. White's job duties. To establish a claim for disparate treatment, an employee must first make a *prima facie* case by showing: (i) that she is a member of a protected class; (ii) that she possessed the minimum qualifications required for the position or benefit she sought (these two elements are conceded by the NFS); (iii) that she experienced an adverse employment action; and (iv) that that action took place in circumstances giving rise to an inference of sex discrimination. *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir. 2007). The burden then shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse action, and the employee bears the ultimate burden of proving that the employer's proffered reason is

false and a pretext for discrimination. *Id.*

For purposes of a disparate treatment claim, an "adverse action" is one that "constitute[s] a significant change in employment status, such as hiring, firing, . . . reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Robinson v. Cavalry Portfolio Services, LLC,* 365 Fed.Appx. 104, 114 (10th Cir. 2010) (unpublished), *citing Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1222 (10th Cir. 2006). Minor or trivial employment actions do not rise to the level of "adverse actions," and "not everything that makes an employee unhappy is [ ] actionable." *Id.* "Mere inconvenience or an alteration of job responsibilities," for example, will not constitute an adverse employment action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004).[5]

Here, Ms. White's complaint about Mr. Yancey's April 22, 2006 decision to increase the amount of range work she would perform (and thus, decreasing the amount of biology work) asserts nothing more than a minor alteration of job responsibilities, and does not amount to an adverse employment action. Ms. White's job duties already included a significant amount of range work – indeed, the mediation agreement contemplated that range work would amount to a full half of her job responsibilities – and the decision by Mr. Yancey that Ms. White's skills and experience were best utilized by increasing her focus on such work is an ordinary incident of management prerogative to assign workers to particular duties within their job classification in

---

[5]Ms. White argues that *Hillig* refutes cases such as *Haynes* that define an adverse employment action by reference to changes in employment status. *Hillig*, a case where the alleged adverse action was a discriminatory negative job reference that impeded the employee's ability to obtain subsequent work, acknowledged that the "adverse employment action" inquiry sometimes requires a "case-by-case approach," and limiting it to only changes in employment status was improper. *Id.* at 1031. Nevertheless, even *Hillig* recognizes that minor alterations in job responsibilities, for example, does not amount to an adverse employment action.

the most efficient and beneficial ways.  Ms. White does not allege that the increased focus on range work caused any significant change in her employment status or benefits – *i.e.* that she lost opportunities for bonuses or recognition that would otherwise have been available.  *Compare Haynes*, 456 F.3d at 1223 (reassignment of job duties could constitute adverse action where commissioned sales employee lost income as the result of being assigned fewer accounts). Rather, Ms. White's complaints about how her employment was affected by the decision to increase her range duties are limited to the fact that she preferred the noxious weed program to range work; that it upset her expectations derived from the mediation agreement; and that several months earlier, she had experienced difficulty with the grazing permit holders who believed she would be soon be leaving the job.[6]  These are merely trivial harms that, although they made Ms. White unhappy, do not rise to the level of a significant, meaningful change to the terms and conditions of her employment.

Mr. Yancey's violation of the mediation agreement appears to be the true subject of Ms. White's ire, but even assuming that his proposal to modify her work duties constituted a breach of that agreement, the Court still fails to see how that amounts to an adverse employment action. Short of an assertion that the mediation agreement is enforceable under contract law – an argument Ms. White does not make – the mediation agreement is little more than a written job description that sets forth expectations as to how an employee's time will be apportioned, or even verbal promises by a supervisor that an employee will be assigned to a particular task.  It is axiomatic that, in the absence of an enforceable contractual agreement limiting their discretion,

---

[6]The record does not indicate whether the resistance Ms. White received from the permit holders in January 2006 continued to exist in April 2006, by which time it would have become clear to them that Ms. White would not soon be leaving her range duties for another job.

employers retain an unfettered right to reallocate job responsibilities and assignments as they see fit.[7] Mr. Yancey's decision to repudiate the mediation agreement's allocation of job tasks might be said to reflect poor management or human resources skills, but so long as the reapportionment occurred within the general sphere of Ms. White's job duties and did so without constituting a meaningful change in the terms and conditions of her employment, the fact that Mr. Yancey's decision ignored a previously-memorialized allocation of job responsibilities does not elevate that decision to an adverse employment action.

Accordingly, the Court finds that Ms. White has failed to come forward with evidence of an adverse employment action sufficient to support her disparate treatment claim, and the NFS is entitled to summary judgment on that claim.

### D.  Retaliation claim

Ms. White alleges that Mr. Yancey's April 22, 2006 directive also constituted prohibited retaliation for her prior complaints of discrimination.  To establish a claim for retaliation under Title VII, an employee must show: (i) that she engaged in protected activity; (ii) that she suffered an adverse employment action; and (iii) that there is a causal connection between the adverse action and the protected conduct; the burden then shifts to the employer to articulate a non-retaliatory reason for the adverse action, and the employee bears the ultimate burden of showing that the employer's proffered reason is a pretext for retaliation.  *Fye v. Oklahoma Corp. Comn.*, 516 F.3d 1217, 1227 (10th Cir. 2008).

The NFS argues that Ms. White cannot show that she engaged in protected activity prior

---

[7]Obviously, anti-discrimination laws constitute another check on employer discretion, but for the reasons stated herein, the Court finds that Mr. Yancey's decision to reallocate Ms. White's job duties does not give rise to a cognizable claim of discrimination.

to April 22, 2006, the date of the alleged adverse action here.  Ms. White responds that, although she did not previously contact an EEO counselor to initiate an official claim of discrimination, she had "informed [NFS] manages, at various times . . . that she felt she was being discriminated against."  For example, she points to her January 2006 complaint regarding "the Agency . . . pushing her out of a job."  Although this complaint appeared to relate primarily to her job duties and the difficulties she was facing with the permit holders, there is some indication that the complaint also involved claims of sex discrimination, as Ms. White was apparently prompted to complain in part by Mr. Leaverton's statement regarding her not "fit[ting] in" with the permit holders, in part, because of her sex.  The Court will assume that this constituted protected activity sufficient to establish the first element of the *prima facie* case.

Ms. White experiences difficulties, however, with the "adverse action" element.  The "adverse action" sufficient to support a retaliation claim is broader than that which will support a disparate treatment claim; to be considered "adverse" for Title VII retaliation purposes, an action must be one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006).  For example, in *Burlington*, the employer reassigned an employee, who had previously complained of discrimination, to perform "more arduous duties" within her job classification, rather than the easier tasks she had traditionally been assigned to do.  *Id.* at 58.  The Supreme Court explained that reassigning an employee to perform more arduous duties instead of those that are easier or more agreeable can amount to an adverse employment action for retaliation purposes.  *Id.* at 70-71.  However, the Court made clear that "reassignment of job duties is not automatically actionable."  *Id.* at 71.  Rather, "whether a particular assignment is materially

adverse depends upon the circumstances of the particular case, and should be judged from the

perspective of a reasonable person in the plaintiff's position, considering all the circumstances."

*Id.*

Here, Ms. White has not come forward with evidence that would lead a reasonable

person in her position to conclude that the increase in range duties assigned to her on April 22

was a materially adverse change. Other than the indication that she had experienced problems

with such duties in January 2006 because of permit holders' attitudes, the record does not reflect

that range duties were generally considered by NFS staff to be particularly arduous or

unpleasant.[8]  *C.f. White*, 548 U.S. at 71 (noting "considerable evidence that the track laborer

duties were by all accounts more arduous and dirtier" than the forklift operator jobs the

employee had previously performed, and that "the forklift operator position was objectively

considered a better job").  Indeed, Ms. White's own brief asserts that she "enjoyed her work and

received very good performance appraisals while she worked with the permittees."  It appears

that Ms. White's resistance to assuming more range duties was simply that she preferred to work

on other tasks – those which she had "ownership" in  – and that the mediation agreement had

created expectations in how much range work she would do.  Without evidence that reasonable

employees in Ms. White's position would have objectively found the range work, by its very

nature, to be less desirable than the other work she was reassigned from, Ms. White has failed to

demonstrate that the reassignment was one that would constitute an adverse action for retaliation

---

[8]Indeed, there is an apparent disconnect between Ms. White's complaints upon returning
from maternity leave that Ms. Van Amburg was continuing to perform the range duties –
suggesting that Ms. White instead desired those duties – and Ms. White's complaints in April
2006 about being assigned more of those very same range duties.

purposes. Accordingly, the NFS is entitled to summary judgment on her retaliation claim.[9]

**E. Hostile environment claim**

To prove a claim of hostile environment sexual harassment, an employee must show her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999). Severity and pervasiveness must be viewed from both objective and subjective perspectives, and require the consideration of factors such as the frequency of the discriminatory

[9]In addition, this Court has doubts that Ms. White could carry her remaining burdens – of showing that there was a causal connection between her protected activity in January 2006 and Ms. Yancey's decision to reassign her duties on April 22, 2006.

A causal connection is usually shown by close temporal proximity – a period of no more than weeks – between the protected conduct and the adverse action. *Fye*, 516 F.3d at 1228. Here, the protected conduct Ms. White alleges – complaining about Mr. Leaverton's comments – occurred sometime after a January 30, 2006 meeting (it is not clear from the parties' briefing precisely when Ms. White did indeed complain of discrimination resulting from this meeting). Assuming that complaint came promptly after the meeting, the adverse action on or about April 22, 2006 occurred somewhere between two and three full months later, a time period that strains the outer boundaries of the temporal proximity test. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (six weeks might be sufficiently close, three months is not). Moreover, the fact that the parties participated in a mediation of Ms. White's complaint on February 28, 2006 – a mediation that all sides praised each other's composure in – ameliorates some of the inference of causation that time alone would provide. Put differently, the fact that the parties sat down, calmly discussed, and mutually resolved Ms. White's complaints makes an inference that the NFS thereafter sought to retaliate against her for complaining of discrimination far less likely.

Assuming that Ms. White could establish a *prima facie* case of retaliation, the NFS has nevertheless proffered a non-retaliatory reason for the decision to increase Ms. White's range duties. Ms. White herself acknowledges that Ms. Van Amburg had left the NFS, leaving a need for someone to perform the duties, and Mr. Yancey believed that Ms. White's experience in that role made her the best candidate to assume those duties. Ms. White points to nothing in the record, other than her subjective belief that one of her less-experienced co-workers should have been assigned the work instead, to indicate that Mr. Yancey's stated justification for selecting Ms. White for the additional duties was false, much less that it was concocted to conceal Mr. Yancey's true retaliatory purpose.

conduct, whether it is physically threatening or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.*

Here, Ms. White has articulated a handful of comments from various actors occurring over a three-year period. Assuming – although it is not entirely clear from the record – that Ms. White found each of the listed comments or actions subjectively offensive, the Court finds that, from an objective perspective, many of the comments she cites do not rise to the requisite level of severity. For example, Mr. Medina's comments to Ms. White about his own wife's breast feeding activities, made during a discussion in which Ms. White was requesting her own accommodations for breast feeding, can hardly be considered impertinent or inappropriate. All of Mr. Sugaski's various comments to Ms. White – inquiring during office space committee meetings why she needed the office, demanding the furniture from the office, stating that he "attempting to get the office back" – reflect nothing more than the undisputed fact that the office was the subject of ongoing territorial disputes among NFS employees. Indeed, Ms. White does not offer any explanation as to why Ms. Sugaski's comments should be construed to be based on her sex, as opposed to being based on his desire to have a private office. There is no allegation that he used sexually-charged language, or extended his inquiries beyond the facial justification as to why Ms. White needed a private office (as opposed to, say, the conference room) for her activities. The fact that Mr. Sugaski may have presented these questions in an intimidating manner adds nothing to the analysis when the questions themselves were utterly free of any sexually-discriminatory content.

Other comments that Ms. White objects to reflect her subjective perception, and perhaps, insecurity, in response to comments that were objectively insignificant. For example, Mr.

Medina's statement about breast feeding taking six weeks in Wyoming (a comment somewhat cryptic in the way it is presented here) does not lead the objective listener to share Ms. White's inference that Mr. Medina was somehow criticizing her desire to breast feed her children longer, particularly where Mr. Medina had previously indicated that his wife was an advocate of breast feeding.  Ms. White's interpretation of Mr. Picard's comment that she could use the bathroom for the "ten minutes" she spent pumping each day as inferring that Mr. Picard was engaging in surveillance of her – as opposed to simply pulling a time period out of thin air – is also without any objective basis.

This leaves relatively few comments that can be said to be sexually-charged, arguably inappropriate for the workplace, and specifically directed at Ms. White.  Mr. Schroeder's comments in 2003 about Ms. White giving birth by "squatting in the woods" and getting back to work immediately reflects discriminatory stereotypes of the needs of new mothers, and his comment in the same year about Ms. White's hormones returning to normal also could be said to reflect discriminatory ideas about pregnant women.  Mr. Medina's 2003 comments about nursing mothers at the Washington D.C. office lining up like "cows" and his 2006 comment to ranchers that Ms. White had been "calving" are more borderline.  Such statements are unflattering and unprofessional, but it is difficult to ascribe any particular sexually-discriminatory significance to these comments.  Mr. Medina did not, for example, suggest that the nursing women were like cows in their intelligence or abilities, but appeared to only suggest that they both shared a key mammalian similarity.   Likewise, the "calving" comment, made to a group of ranchers, appears to be little more than a folksy way of informing them that Ms. White was away from work for maternity reasons.  Finally, the Court turns to Mr. Leaverton's comment that Ms. White would

not by "culturally accepted" by the permit holders because, among other things, she was a woman.  Ms. White's own testimony makes clear that she understood that Mr. Leaverton's comment was a means of acknowledging the fact that the <u>ranchers</u>' attitudes towards here would be colored by their perception of her sex (among other cultural differences), not a statement that Mr. Leaverton's attitude towards her was.  This appears to be advice to Ms. White to be cognizant that others that she may have to deal with might harbor prejudices against her, particularly where there is no evidence whatsoever that Mr. Leaverton somehow shared those prejudices.

Sifting this collection of statements, there are fewer than a handful of statements having any discriminatory connotation.[10]  Nearly all of the comments occurred years before Ms. White's complaints, are at odds with the accommodations made for her during and after her pregnancies, and do not appear to have affected her ability to perform her work.  Indeed, as the discussion above indicates, Ms. White attributes her work-related difficulties solely to problems created by co-workers' territoriality over the office space that she was occupying by the grace of Mr. Medina (and over the objections of the office space committee) and problems created by Mr. Medina mistakenly letting the permit holders know that Ms. White might be promoted out of her

---

[10]Admittedly, hostile environment claims are not limited to verbal statements; discriminatory actions by an employer can be components of a hostile work environment. However, for the reasons discussed above, the Court has found that Ms. White has failed to demonstrate that any of the NFS' actions with regard to her are sufficiently significant as to constitute actionable discrimination.  There may be circumstances where an employee is subjected to numerous sex-based actions, and the aggregate of those actions gives rise to a hostile environment claim despite none of the individual events being actionable on its own.  But that situation is not presented here.  The single decision by Mr. Yancey to change Ms. White's work duties, even when coupled with the few sex-based comments made in 2003, and even when viewed in the light of repeated efforts by Ms. White's co-workers to appropriate the private office for themselves, simply does not rise to the level of an actionable hostile environment.

job.  Thus, the Court finds that Ms. White has failed to come forward with evidence that would demonstrate that she was exposed to a working environment that was <u>objectively</u> hostile.  The NFS is therefore entitled to summary judgment on this claim.

**E.  Privacy Act claims**

Finally, Ms. White asserts two claims pursuant to the Privacy Act.  First, she contends that the NFS improperly disclosed protected information regarding her EEO complaint – specifically, that it disclosed the full "Report of Investigation" ("ROI") to various individuals, including Mr. Sugaski, Mr. Picard, and Mr. Schroeder[11] – in violation of 5 U.S.C. § 552a(b).  Second, she contends that the NFS failed to enact adequate safeguards to protect the privacy of confidential information, in violation of 5 U.S.C. § 552a(e)(10).

5 U.S.C. § 552a(b) provides that "No agency shall disclose any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless certain specified exemptions to this rule are met.   An employee asserting a claim of improper disclosure must show: (i) that the information disclosed was a "record," contained within a "series of records" as those terms are defined; (ii) that the agency disclosed the information; (iii) the disclosure had an "adverse effect" on the employee, in that it was the cause of some cognizable injury to the employee; and (iv) the disclosure was "willful or intentional."  *Quinn v. Stone*, 978 F.2d 126, 131 (3d Cir. 1992).  The NFS contends that Ms.

---

[11]The entirely of Ms. White's explanation in her response brief of the events underlying the Privacy Act claim states that "Agency representative Jack Neuman . . . shipped the ROI off to Mr. Sugaski with a request that Mr. Sugaski make and distribute copies of the ROI.  Mr. Sugaski did just that.  He copied Ms. White's ROI in full and gave it to Mr. Schroeder . . . and Mr. Picard."  (Citations and parentheticals omitted.)

White cannot show that the ROI concerning her EEO complaint was maintained in a "system of records," that it was disclosed, that such disclosure was intentional or willful, and that she did not expressly consent to such disclosure.[12]

The Court turns first to the NFS' argument that Ms. White cannot show that the ROI that was disclosed was obtained from a "system of records." A "system of records" is a group of records maintained by the agency "from which information is retrieved by the name of the individual" or by some other data specifically identifying the employee. 5 U.S.C. § 552a(a)(5). It is essential that the disclosure being challenged occurred as "the result of someone having actually retrieved the 'record' from that 'system of records'"; it is not enough to show simply that the information disclosed is contained in a system of records without showing that it was retrieved from such a system. *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010). The focus of an improper disclosure claim under the Privacy Act is "misuse of the government's sophisticated systems for collecting and storing personal information." *Doe v. Dept. of Veterans Affairs*, 519 F.3d 456, 462 (8th Cir. 2008).

In response to the NFS' contention that Ms. White cannot establish that the ROI was maintained within and retrieved from a "system of records," Ms. White points to the following items of information: (i) deposition testimony by Daniel Rosenbluth, the "Agency's counsel in

---

[12]The Court notes that the NFS did not purport to identify the undisputed facts that show that Ms. White cannot establish this claim. Fed. R. Civ. P. 56 requires the party asserting an absence of material fact as to a particular element to point to the evidence in the record that reveals that fact to be undisputed. *Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir.. 2002). Although not yet in effect, the revisions to Fed. R. Civ. P. 56(c), taking effect on Dec. 1, 2010, make clear that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to evidence in the record demonstrating the absence of a factual dispute or evidence in opposition to the fact being asserted.

administrative EEO cases"; (ii) a representation in a "Pretrial Statement" issued by the Administrative Law Judge hearing Ms. White's EEO complaint; (iii) the contents of a disclaimer included in Ms. White's affidavit in support of her EEO complaint.  The Court addresses each of these items in turn.

Mr. Rosenbluth's testimony was given in a case involving a different employee, and thus, the significance of his answers is necessarily constrained by that context.  In the portions of Mr. Rosenbluth's deposition cited by Ms. White's response (pages 116-118), Mr. Rosenbluth was asked "why wouldn't you show the entire report to, say, Paul Crespin or Carl Bauer . . .?"  Ms. Rosenbluth responded that "in my judgment, that is not the best practice."  He was then asked "it would violate the Privacy Act, wouldn't it?" and, after an objection and some colloquy, Mr. Rosenbluth was again asked "you didn't get the report of investigation to anyone else who was a witness in the case, because it would violate the Privacy Act to do that, wouldn't it?," to which Mr. Rosenbluth answered "Yes, I think that's probably correct."  Mr. Rosenbluth then sought to qualify his answer, explaining that "not every such release would, depending on the state of . . . sophistication of the releaser. . . ."  At this point, the questioner interrupted, stating "I didn't ask you if every such release would, I asked you about this case, this ROI . . . ."

The Court finds several reasons why Mr. Rosenbluth's testimony fails to establish that Ms. White's ROI was retrieved from a "system of records" for purposes of the Privacy Act.   Mr. Rosenbluth never expressly testified that every NFS ROI was contained within a "system of records," nor that the only way for a person to obtain such an ROI was to retrieve it from such a system.  Mr. Rosenbluth testified only that, in a particular case, the release of an ROI to certain persons would, in Mr. Rosenbluth's opinion, constitute a Privacy Act violation.  Ms. White's

attempt to use this testimony to carry her burden of proving that <u>her</u> ROI was accessed from a "system of records" suffers from several logical flaws.

First, she assumes that, in expressing the opinion[13] that the disclosure of the ROI to a witness in that case would constitute a Privacy Act violation, Mr. Rosenbluth was implicitly testifying that the ROI in that case was retrieved from a "system of records." Ms. White does not cite to any evidence in the record that warrants drawing such an inference. It is not clear whether Mr. Rosenbluth is aware of the "system of records" element of Privacy Act liability, nor that he was intending his opinion to incorporate a tacit finding that such an element was met in the situation about which he was testifying. Even assuming that Mr. Rosenbluth was testifying that, in <u>that case</u>, the employee's ROI had been retrieved from a "system of records," nothing in his testimony warrants the conclusion that <u>Ms. White</u>'s ROI was similarly retrieved from such a system. Indeed, the final quoted language from the deposition, in which the questioner makes clear that her inquiry was limited to the particular circumstance and that she was not inquiring whether "every release" of an ROI would violate the Privacy Act would appear to doom Ms. White's reliance on Mr. Rosenbluth's testimony. Admittedly, both cases appear to involve an ROI, but beyond that fact, nothing in the cited portion of Mr. Rosenbluth's testimony sets forth the particular facts of the case he was addressing, such that this Court could conclude that the situation presented in that case – that is, how the employee's ROI was retrieved – and the facts developed here are identical. Thus, the Court finds that Mr. Rosenbluth's testimony does not establish that <u>Ms. White</u>'s ROI was retrieved from a "system of records."

_____

[13]Ms. White does not represent that Mr. Rosenbluth was designated as an expert witness in <u>this</u> case, such that his opinion with regard to a particular matter would be admissible.

The advisement by the ALJ also fails to satisfy Ms. White's burden. The ALJ's advisement warns the parties that "The Privacy Act of 1974 protects the information contained in the investigative file and unauthorized disclosure of any information protected by the Privacy Act of 1974 may subject the person making the disclosure to civil or criminal liability." The Court notes that the ALJ's disclaimer is phrased in potential, not absolute terms: "unauthorized disclosure . . . <u>may</u>" result in liability. Whether or not unauthorized disclosure of such information gives rise to liability will depend on a number of factors, including whether such a disclosure occurred as a result of retrieval of the record from a "system of records" or by some other means. The ALJ's statement thus sheds no light on the question of whether, when Ms. White's ROI actually was disclosed, the ROI had been retrieved from a "system of records."

Likewise, Ms. White's affidavit contains advisements that "any employee(s) whom I accuse of discrimination . . . may be shown relevant portions of this statement," and that "any employee accused of discrimination will have an opportunity to review a sanitized version of the report." Ms. White seizes on the fact that other employees have access to only "relevant portions" or a "sanitized version" of the affidavit or investigative report, but again, this language at best only advises employees of the <u>possibility</u> that improper disclosure of the information contained in the affidavit or investigative report can give rise to Privacy Act liability. The requirement that the disclosed record have been obtained from a "system of records" is a specific, fact-based inquiry that examines how the information was obtained <u>in the particular circumstances of the case</u>. Disclaimers or advisements, such as those in Ms. White's affidavit or given by the ALJ, shed no light on how the ROI here was actually obtained. As a result, they are insufficient to satisfy Ms. White's burden of showing that the ROI was obtained from a system

of records.  Thus, the NFS is entitled to summary judgment on her disclosure-based Privacy Act claim.

Finally, Ms. White's Privacy Act claim asserts failure to devise a system of safeguards for confidential employee information invokes 5 U.S.C. § 552a(e)(10).  That provision states "Each agency that maintains a system of records shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records."  The government is not liable for every affirmative or negligent act that technically violates the Privacy Act," and a claim premised on failure to enact adequate safeguards requires an employee to show that "the violation must be so patently egregious and unlawful that anyone undertaking the conduct should have known it was unlawful," or that the agency "flagrantly disregarded the rights guaranteed under the Privacy Act."  *Alexander v. FBI*, 691 F.Supp.2d 182, 192 (D.D.C. 2010).  In addition, even if the employee shows that the agency's safeguards were inadequate, the employee must additionally show that the agency's failure to promulgate appropriate safeguards was "willful and intentional."  *Id.*

Here, the NFS has come forward with evidence that has published regulations regarding the safeguarding of records subject to the Privacy Act, and alleges that Ms. White cannot show that it failed to enact such safeguards nor show that any such failure was willful.  Ms. White responds that she does not dispute that "the Agency has a right to establish its own safeguards for Privacy Act information, so long as those safeguards are adequate to satisfy the statute."  But she goes on to state that the NFS' "bald assertion that it did so in this case is disproved by Mr. Neuman's testimony," in which he explains that he took precautions to ensure that the ROI was

protected from disclosure under the Privacy Act,[14] but that he failed to advise Mr. Sugaski of that fact, and "just assumed Mr. Sugaski would know that."

Unlike the prior Privacy Act claim, where Ms. White's evidence failed for being insufficiently specific, this claim fails because her evidence is insufficiently general. A safeguards-based Privacy Act claim focuses on the particular safeguards created by the agency, and requires an assessment of whether they are, in general, sufficient to protect employees' privacy rights. Ms. White's response points out no particular flaw in the safeguards the NFS has established. Instead, she focuses only on one instance in which those safeguards proved ineffective. As *Alexander* explains, safeguards liability is not established simply by "every affirmative or negligent act" an employee commits when failing to carry out the agency's policies. Without a showing that the NFS' policies, not simply Mr. Neuman's implementation of them, Ms. White fails to establish a safeguards claim.[15]

---

[14]According to the cited portion of Mr. Neuman's deposition, the precautions he took consisted of "only g[iving] it to individuals that I felt had a need to know, and I kept it locked up." He admits that his precautions were not aimed at "anyone who would receive it further down the line," such as endorsing "'Privacy Act' [on it] in big letters."

[15]Moreover, the Court notes that there is no evidence in the record whatsoever to show that Mr. Neuman's acts, much less the NFS' in general, were willful as opposed to simply negligent.

## CONCLUSION

For the foregoing reasons, the NFS' Motion for Summary Judgment  (# **57**, as amended

**#82**) is **GRANTED**.  The Clerk of the Court shall enter judgment in favor of the Defendant.

Dated this 7th day of September, 2010

BY THE COURT:

Marcia S. Krieger
United States District Judge